# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN
## MADISON DIVISION

| | | |
|---|---|---|
| **PAMELA KILTY, Individually and as Special Administrator of the Estate of ELVIRA KILTY, Deceased, PAUL J. KILTY, DAVID L. KILTY, WILLIAM J. KILTY, and JAMES S. KILTY,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:16-cv-00515-wmc** |
| **v.** | ) ) | |
| **WEYERHEAUSER COMPANY, et al.,** | ) ) | |
| **Defendants.** | ) ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT 3M COMPANY'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.      INTRODUCTION .............................................................................................. 1

II.     ARGUMENT ...................................................................................................... 2

        A.      The Sophisticated User/Employer Defense is Not Applicable .............. 2

                1.      There is no case law in Wisconsin permitting the sophisticated user
                        defense as a bar to claims based on strict product liability. ...................... 3

                2.      3M must have been aware of Weyerhaeuser's knowledge at the time
                        it supplied its products. ............................................................................ 3

                3.      The cases cited by 3M in support of its sophisticated user defense
                        are completely distinguishable from the facts at bar. ................................ 5

        B.      Plaintiffs can overcome the presumption that the 3M 8710 was not

                defective. ............................................................................................... 9

                1.      Pressure drop was relevant to face seal leakage and was not just a
                        comfort issue. ....................................................................................... 10

                2.      3M was required by NIOSH, USBM, and its own Quality Assurance
                        Manual to routinely conduct the silica dust test on the 8710 to ensure
                        compliance with NIOSH/USBM requirements for penetration and
                        pressure drop. ...................................................................................... 12

                3.      3M did not communicate to NIOSH/USBM that the 8710 respirator
                        routinely and consistently failed NIOSH/USBM requirements for
                        pressure drop under the silica dust test. ................................................ 13

                4.      The law of rebuttable presumptions. ...................................................... 21

        C.      The 8710 Did Not Meet Consumer Expectations of Safety ................ 22

        D.      Negligence Claims Against 3M ......................................................... 23

        E.      Punitive Damages ............................................................................. 24

III.    CONCLUSION ............................................................................................... 27

i

# TABLE OF AUTHORITIES

**Cases**

*Gray v. Badger Mining Corp.*,
676 N.W.2d 268 (Minn. 2004) ........................................................................................ 9

*Haase v. Badger Mining Corp.*,
266 Wis.2d 970 (Wis. App. 2003) ............................................................................... 7, 8

*Haase v. Badger Mining Corp.*,
274 Wis.2d 143 (Wis. 2004) .......................................................................................... 7

*Hall v. Boston Scientific Corp.*,
2015 WL 874760 (S.D.W.V.) ....................................................................................... 21

*Hanson v. Engebretson*,
239 Wis. 126 (1941) ..................................................................................................... 22

*Hornback v. Archdiose of Milwaukee*,
313 Wis. 2d 294, 752 N.W.2d 862 (2008) ................................................................... 24

*Mohr v. St. Paul Fire & Marine Ins. Co.*,
2004 WI App 5, 269 Wis. 2d 302 (Wis. Ct. App. 2003) ............................................. 3, 4

*Strenke v. Hogner*,
279 Wis. 52 (2005) ....................................................................................................... 25

*Triplett v. Minnesota Mining & Mfg. Co.*,
422 F. Supp. 2d 779 (W.D. Ky. 2006) ........................................................................ 6, 7

**Statutes**

30 C.F.R. § 11 ....................................................................................................... passim

Wis. Stat. § 895.043 ...................................................................................................... 25

Wis. Stat. § 895.047(3)(b) ....................................................................................... 10, 21

Wis. Stat. § 903.01 ........................................................................................................ 22

**Rules**

Fed. R. Evid. 301 .......................................................................................................... 21

Fed. R. Evid. 302 .......................................................................................................... 22

**Treatises**

Restatement (Second) of Torts § 402A cmt. G (1965) .................................................................. 23

Now Comes Plaintiffs, by and through their undersigned counsel of record, and hereby oppose Defendant 3M Company's ("3M" or "Defendant") Motion for Summary Judgment.  For the reasons stated herein, Plaintiffs respectfully request that Defendant's Motion be denied in its entirety.

## I.    INTRODUCTION

3M has moved for summary judgment on three distinct grounds:  (1) the sophisticated user defense; (2) the presumption that the 3M 8710 mask was non-defective due to the alleged NIOSH compliance; and (3) assuming the presumption is overcome, 3M argues that the 8710 mask met consumer expectations, and was, therefore, not defective.  Finally, 3M moved for partial summary judgment striking punitive damages.

3M has mischaracterized Plaintiffs' claims against 3M for the sale of the 8710 single use, disposable respirator.  This single use, disposable respirator was marketed by 3M as certified by NIOSH.  This NIOSH certification meant it could be used to protect against asbestos fibers up to ten times the Permissible Exposure Limit (PEL).  As explained in 3M's Statement of Proposed Findings of Fact ¶ 60, a protection factor of ten means the exposure levels of fibers inside the mask are ten times lower than the levels outside the mask, i.e., in the air around the worker.

The obvious purpose and intended use of the 8710 mask was to have the worker's breathing zone kept within the "Permissible Exposure Limits" (PEL) mandated by Wisconsin state law or by OSHA regulations that were promulgated in 1972.  In fact, as 3M's own Statement of Facts concede, Weyerhaeuser Company (hereinafter "Weyerhaeuser") bought the 3M 8710 for the explicit purpose of protecting its workers from harmful levels of asbestos fibers and keeping its employees within the PEL, i.e., the then recognized "safe" level of asbestos exposure.

Elvira Kilty's ("Plaintiffs' Decedent") co-workers testified that she wore the 3M 8710 mask whenever she was in a department that required her to do so.  Plaintiffs' Additional Statement

1

of Proposed Findings of Fact ("PAFF") ¶¶ 113, 117.  Her co-workers also believed that the masks were required to be won in order to protect them from asbestos as 3M represented.  PAFF ¶¶ 112, 114.

3M also mischaracterizes Plaintiffs' claims as "failure-to-warn about the dangers of asbestos."  Yet, Plaintiffs make no such claims.  Rather, Plaintiffs claim the 3M 8710 never met the standards to qualify for certification.  As explained in detail below, 3M knew that without inhalation valves, the 8710 could never meet the requirement for inhalation and exhalation pressure drop under the "silica dust test" required for NIOSH certification.  Essentially, 3M misrepresented its results for the certification test.  3M knew its 8710 was not meeting the test requirements and failed to inform NIOSH of this fact.

Thus, 3M was both intentionally deceptive and grossly negligent in the testing, manufacturing, and selling of the 8710, which was defectively designed in that it could not do what 3M represented it was supposed to do, even if used exactly as instructed.  The 8710 was not what 3M represented—in compliance with NIOSH certification standards, and it did not protect workers as 3M warranted.  As a result, Plaintiffs' Decedent, Elivra Kilty, developed mesothelioma and passed away.   PAFF ¶ 114; Plaintiffs' Response to 3M's Proposed Findings of Fact (hereinafter "RFOF") ¶ 1.

## II.   ARGUMENT

### A.   The Sophisticated User/Employer Defense is Not Applicable

3M spends the bulk of its motion arguing that, due to its knowledge regarding the hazards of asbestos, Weyerhaeuser was a sophisticated user of 3M's 8710.  The gist of 3M's evidence shows that Weyerhaeuser knew asbestos was dangerous, wanted to protect its employees from asbestos, and provided the 8710 to its employees in reliance on 3M's representations that the 8710

was properly certified under NIOSH standard, thus it could protect them from dangerous levels of asbestos fibers.

Plaintiffs do not claim 3M should have warned Elvira Kilty, herself, about asbestos dangers. That is a gross mischaracterization of Plaintiffs' position. The only failure to instruct or warn claim here could be (1) a failure to warn that the 8710 was completely useless to protect anyone, not specifically Elvira Kilty, against asbestos, even if used exactly as instructed; and (2) to warn that the 8710 did not meet NIOSH certification standards, i.e., that it did <u>not</u> provide a protection factor of ten. But this really means that the 8710 should not have been sold to protect against asbestos, a result that eventually happened in the late 1980s.

   1. <u>There is no case law in Wisconsin permitting the sophisticated user defense as a bar to claims based on strict product liability.</u>

The sophisticated user doctrine is not a defense to strict product liability claims asserted in this case. *See Mohr v. St. Paul Fire & Marine Ins. Co.*, 2004 WI App 5, ¶34, 269 Wis. 2d 302, 331-332 (Wis. Ct. App. 2003) ("While we have acknowledged the difficulty of distinguishing between a negligence claim and a strict product liability claim when both are based on an allegedly inadequate warning, . . . we are reluctant, without more guidance from the supreme court, to import doctrines from the former into the latter."). In *Mohr*, the Court declined to apply the sophisticated user doctrine to analysis of a strict products liability claim under Restatement (Second) of Torts, § 402A. Mohr, 2004 WI App 5 at ¶34.

In light of the refusal of the Wisconsin appellate courts to extend the doctrine of sophisticated user to strict product liability claims, this Court should reject 3M's attempt to do so in the instant matter.

   2. <u>3M must have been aware of Weyerhaeuser's knowledge at the time it supplied its products.</u>

3

According to case law, for applicability of the sophisticated user defense, the Defendant must prove it had reason to believe the user had knowledge of the dangerousness of the products at the time it supplied the product. *See Mohr*, 2004 WI App. 5 at ¶ 20 ("We first observe that the issue . . ., correctly framed, is whether KDI had reason to believe that the high school had knowledge the platforms were likely to be dangerous if used in less than five feet of water, not whether the high school actually did have that knowledge.").  There is no evidence in the record that Weyerhaeuser knew the 8710 did <u>not</u> meet the requirements for NIOSH/Bureau of Mines certification for use with asbestos, nor that the 8710 did <u>not</u> provide a protection factor of ten. Indeed, 3M's Proposed Finding of Fact ¶ 60 shows Weyerhaeuser believed the 8710 did provide a 10 to 15 protection factor.  Because the sophisticated user defense is by definition a defense to a failure to warn claim, 3M's motion for summary judgment on sophisticated user/employer should be denied as a matter of law, or denied as moot.  3Mn has made no showing that it relied upon or had any knowledge of what Weyerhaeuser knew about asbestos at the time the products were purchased to establish the absence of any disputed issue of material fact about the element of reliance in the earlier time frames, rather 3M is only aware now whether Weyerhaeuser had any knowledge about asbestos due to this litigation.   3M makes conclusory statements about 3M's potential reliance which are not supported by fact.

3M incorrectly argues that any entity who has knowledge becomes a sophisticated user as a matter of law.  3M cites no Wisconsin decision where knowledge alone establishes this defense. What an employer should have known or knows about potential dangers does not prove it possesses the level of sophistication needed to protect employees.  If the defense can be proved based only on what an employer knows or should know, the term "sophisticated user" is meaningless.  The defense requires that the product supplier have knowledge at the time it supplies

its product to the user that the user has the ability and skill to use protective measures against the dangers that are known and to have implemented such measures.

3M has failed to produce any facts to show 3M's knowledge of and reliance on Weyerhaeuser's knowledge or the safety precautions undertaken by them. There is no evidence Weyerhaeuser knew the 8710, which was advertised as being NIOSH certified for use with asbestos, was actually unable to meet NIOSH testing requirements and did not provide a protection factor of ten. 3M is not claiming Weyerhaeuser misused the 8710. The 8710 was used exactly as marketed.

Even if 3M argued that Weyerhaeuser was misusing the 8710, which would be a proper defense to a design defect claim, there is no evidence in the record to support such an argument. In fact, the evidence supports the opposite. Testing performed by Weyerhaeuser's industrial hygienist, Joseph Wendlick, revealed that from June 1972 to February 1973, all but one of the fiber concentration counts were below ten times the PEL of 5 fibers/cc. PAFF ¶¶ 99-101. Further, from May 1973 to June 1973, all of the fiber concentration counts were well below ten times the PEL of 5 fibers/cc, and the vast majority were below the PEL itself. *Id.* The one count that exceeded ten times the PEL was noted as being a peak concentration. PAFF ¶ 100. 3M represented that the 8710 was certified by NIOSH. NIOSH certification of single use respirators meant they be properly utilized in environments containing asbestos that were up to ten times the PEL. PAFF ¶ 99, RFOF ¶ 86. There is no evidence to suggest that Weyerhaeuser was misusing the 3M 8710 respirator.

3.   The cases cited by 3M in support of its sophisticated user defense are completely distinguishable from the facts at bar.

While the argument above is sufficient to deny 3M's Motion on the sophisticated user defense, it is instructive to distinguish the cases 3M cites and show how inapposite they are.

5

The primary case 3M cites is *Triplett v. Minnesota Mining & Mfg. Co.*, 422 F. Supp. 2d 779 (W.D. Ky. 2006).  In *Triplett*, the federal court applied Indiana product liability law.  422 F. Supp. 2d at 783.  Triplett was a pipefitter at the Colgate Palmolive Plant from 1976 to 1985 where he was exposed to asbestos in the course of his employment.  *Id.* at 781.  His employer gave him the **3M 8500 Non Toxic Mask** to protect him from asbestos.  *Id.* at 784-85.  The evidence was undisputed that the 8500 was **not** designed and **not** marketed to protect against toxic dusts.  *Id.* at 784.  Thus, this "simple" nontoxic dust mask "functioned as it was designed to function."  *Id.* at 784.

By contrast, the mask at issue in this case, the 8710, was designed and marketed as NIOSH certified to provide a protection factor of ten against asbestos.  The 8710 did not really meet the NIOSH certification standards and internal testing revealed it could not provide a protection factor of ten.  Thus, the 8710 did not function as it was designed to function.

In *Triplett*, the 8500 was simply not defective.  *Id.* at 785.  Thus, *Triplett* alleged a failure to provide an "adequate warning designed to prevent foreseeable misuse."  *Id.*  Given that Colgate was sophisticated enough to know that one should provide respirators that are designed to protect against toxic dust to those exposed to toxic dusts, and not to give "nontoxic" dust masks, the court held 3M had no additional duty to warn.

As the court explained, "The Model 8500 Nontoxic Particle Mask was designed, marketed and sold, as the product label indicated, for 'filtration for nontoxic dusts, powders and spray particles.'"  *Id.* at 874.  The court further explained, "There is no evidence that the Model 8500 mask was respresented by 3M to be effacious for other than nontoxic dust . . . as indicated on the product label."  *Id.* at 784, n. 1.  Thus, it was straightforward for the court to dismiss any claim for failure to warn against misuse.

> There is no evidence creating a genuine issue of material fact concerning whether Colgate-Palmolive had the sophistication necessary to discern that a mask designed and sold for use in exposures to nontoxic materials should not be used in a toxic environment . . . It purchased respiratory protection devices for both toxic and nontoxic exposures.  There is no evidence to suggest that 3M could not reasonably rely upon the sophistication of Colgate-Palmolive in utilizing proper respiratory protection for its employees in various manufacturing environments.

*Id.* at 786.

In this case, Weyerhaeuser used the 8710 for exactly what 3M marketed and sold it for: asbestos protection up to ten times the PEL.

3M also cites and extensively discusses *Haase v. Badger Mining Corp.*, 266 Wis.2d 970 (Wis. App. 2003).  First, as clarified on appeal by the Wisconsin Supreme Court, all "the respiratory manufacturers settled with Haase prior to trial," (presumable including 3M).  *Haase v. Badger Mining Corp.*, 274 Wis.2d 143, 148, n. 1 (Wis. 2004).[1]  Thus, *Haas* has no relevance to a claim against 3M for a defective 8710 respirator.

To the extent 3M cites *Haase* for the application of the sophisticated user defense, to failure to warn about asbestos, this is a red herring.

As 3M argues:  "Like the defendant in *Haase*, [i.e., the bulk sand supplier], 3M had no duty to warn Weyerhaeuser or, by virtue of his [sic] employment, Decedent, because Weyerhaeuser knew the 'potential dangers' of asbestos and was 'aware of the characteristics' of the 3M 8710."  3M Brf. in supp. Mot. Summ. J. at p. 14.

First, Plaintiffs do not claim 3M should have warned Weyerhaeuser or the "end-users" about the potential dangers of asbestos.  The 8710 was being used by Weyerhaeuser to protect against dangerous levels of asbestos.  3M has provided no evidence that Weyerhaeuser knew the

---

[1] The Wisconsin Supreme Court held it was incorrect to hold the Restatement (3d) of Torts was Wisconsin law.  The Court of Appeals was affirmed in that changing the sand (which defendant sold) from nontoxic large particles to dangerous fine particles at the foundry exonerated the defendant/sand supplier from strict products liability.  274. Wis. 2d at 160-61.

7

8710 failed to meet NIOSH certification standards, failed the "silica dust" inhalation/exhalation tests, and could not provide a protection factor of ten.

Second, the facts in *Haase* actually demonstrate the liability of 3M in the *Haase* case. From 1993-1996, Haase worked as a sand grinder at the Foundry. Due to the silicosis hazard, he wore the 3M 8710 respirator, nevertheless this was the wrong respirator. 669 N.W.2d at 739.

> In 1992, NIOSH issued two alerts dealing with the proper type of respiratory protection for silica dust. In these alerts, NIOSH recommended that only approved respirators equipped with high-efficiency filters should be used [where the air was up to 5 times the PEL]. In 1994, NIOSH again recommended . . . that an approved respirator with a high-efficiency filter should be used . . ."

*Id.* at 740. As such, it was public knowledge by 1993 that the 8710 was not effective for silica dust.

However, the Foundry did not rely on the bulk sand supplier for its respirator choice. Rather, it relied upon 3M. "O'Brien [a former safety director of the Foundry] testified that he made the decision to purchase the respirator Haase wore from 1993 to 1996, the 3M 8710, **after consulting with 3M representatives**." *Id.* at 740 (emphasis added). Here, in the matter before this Court, Weyerhaeuser's decision to use the 8710 from 1973 to 1978 was based upon 3M's representation that the 8710 met the NIOSH certification requirements for use with asbestos dust and provided a protection factor of ten against asbestos.

Other illustrative facts in *Haase* are as follows:

> Dr. Hammar [Plaintiff's expert] testified that the respirator Haase wore leaked approximately fifty percent of the harmful silica particles that were in an around Haase . . . [I]f a respirator with a high-efficiency filter had been used; only three particles out of 100,000 would have leaked through . . .

*Id.* at 741.

The *Haase* Court of Appeals opinion was distinguished by the Minnesota Supreme Court in a case more factually akin to the matter at hand. *Gray v. Badger Mining Corp.*, 676 N.W.2d

268 (Minn. 2004).  In *Gray*, the theory was that disposable respirators were ineffective to use for silica dust.  The employer relied upon both 3M and the bulk sand supplier as to what respirators to use.  Again, as in *Haase*, 3M apparently settled this case prior to trial.  Thus, the facts in *Gray* supporting the "argu[ment] that Smith Foundry relied on 3M to provide respiratory protection" were not developed in the opinion.  676 N.W.2d at 272-73.

When discussing the sophisticated user defense, the evidence demonstrated that the bulk sand supplier knew that disposable respirators were ineffective, but the Foundry did not.

> [T]here are genuine issues of material fact that preclude summary judgment . . . Badger Mining did provide Smith Foundry with a general warning of the dangers of silicosis but **it did not warn Smith Foundry about the ineffectiveness** of disposable respirators or instruct that the only high efficiency respirators be used . . . [It] can not be said to [be] conclusively establish[ed] that Smith Foundry's knowledge was equal to that of Badger Mining . . . [T]here is no evidence that Smith Foundry shared in the special knowledge possessed by Badger Mining that disposable respirators were ineffective.

*Id.* at 279 (emphasis added).  Likewise, there is no evidence that Weyerhaeuser knew between 1973 and 1979 that the 8710 single use disposable respirators did not meet the NIOSH certification requirements and did not provide a protection factor of ten.

**B.     Plaintiffs can overcome the presumption that the 3M 8710 was not defective.**

The primary ground that 3M seeks summary judgment is 3M's contention that the 8710 complied with NIOSH standards.  Actually, 3M alleges:  "The 3M 8710 respirator maintained uninterrupted NIOSH certification as a single-use respirator from 1972 until 1998 . . ."  3M SPFF ¶ 18 (3M memo at 17).  However, the actual language of this presumption is as follows:

> Evidence that the product, at the time of sale, complied in material respects with relevant standards, conditions, or specifications adopted or approved by a federal or state law or agency shall create a rebuttable presumption that the product is not defective.

Wis. Stat. § 895.047(3)(b).  Under this language, "certification" does not create the rebuttable presumption.  Rather, compliance in <u>material respects</u> with relevant standards and specifications adopted by a federal agency creates the rebuttable presumption.

As explained in detail in Plaintiffs' Additional Findings of Fact, the 8710 never "complied in material respects" with NIOSH regulations.  3M makes a number of false statements in support of its claim that the 8710 was not defective, which can be broken down into three main arguments: (1) that the pressure drop aspect of the silica dust test was merely a comfort issue and was not related to the effectiveness of the 8710; (2) that 3M was not required to conduct their own silica dust test for penetration and pressure drop requirements; and (3) that the National Institute for Occupational Safety and Health (NIOSH) and the U.S. Bureau of Mines (USBM) changed or altered the silica dust test, which caused 3M's 8710 to fail its internal silica dust test, nevertheless the 3M 8710 maintained uninterrupted certification.

As will be shown below:  (1) pressure drop was directly related to face seal leakage and not just a comfort issue; (2) 3M was required by NIOSH, USBM, and its own quality control manual to routinely conduct the silica dust test on the 8710 to ensure compliance with NIOSH/USBM requirements for penetration and pressure drop; and (3) 3M's 8710 respirator could never pass the silica dust test for pressure drop whether it was before or after NIOSH/USBM certification, the DOP test that 3M received permission to substitute for production information had no correlation to the silica dust test for pressure drop, and this important information was never communicated to NIOSH/USBM.

           1.    <u>Pressure drop was relevant to face seal leakage and was not just a comfort issue.</u>

3M erroneously claims that pressure drop was merely a comfort issue and had no effect on the ability of the respirator to reduce a wearer's exposure to pneumoconiosis-producing dusts.

RFOF ¶ 88. This is completely wrong. The valveless design promotes considerable condensed moisture collection on the paper which increases the pressure drop or breathing resistance causing the loss of rigidity and additional facepiece edge to face leakage. PAFF ¶ 4; RFOF ¶ 88. This is corroborated in an article written by a member of 3M's own occupational health and environmental safety division. PAFF ¶ 21; RFOF ¶ 88. According to the 3M author, single use particulate filters, such as the 3M 8710, generally tend to become more efficient with use. PAFF ¶ 22. This is because "a filter cake is formed that increases filter efficiency," but also increases the pressure drop, or breathing resistance. PAFF ¶ 22. Thus, "resistance to airflow generally increases as the filter load and a 'filter cake' is formed." PAFF ¶ 22. The 3M author concluded that for single use particulate respirators, the "increasing breathing resistance [pressure drop] increases the faceseal leak rate." PAFF ¶ 23. Additionally, the increase in faceseal leakage from 5.6 mm to 19.6 mm pressure drop was found to be as high as a factor of 4. PAFF ¶ 23.

Furthermore, it is clear that NIOSH did not pick an arbitrary number for inhalation and exhalation breathing resistances without regard to the respirator's ability to reduce a user's exposure to pneumoconiosis producing dust. PAFF ¶ 26; RFOF ¶ 88. Prior to the enactment of 30 C.F.R. § 11, 3M petitioned USBM to raise the final pressure drop from 15 mm to 20 mm. PAFF ¶¶ 27-32; RFOF ¶ 88. USBM/NIOSH denied 3M's request, making it clear that maintaining inhalation and exhalation breathing resistance below 15 mm was a critical part of the 8710's certification for use with asbestos under 30 C.F.R. Part 11. PAFF ¶ 33; RFOF ¶ 88.

3M's own Quality Control Manual classified deviations from NIOSH specified inhalation and exhalation test result valves as a Major A defect. PAFF ¶¶ 13, 24; RFOF ¶ 88. 3M knew that because "pressure drop and penetration [were] both Major A type defects," they had to bring the Acceptable Quality Limit (AQL) down to 1% in order to "be in compliance with the regulations

and maintain our certification." PAFF ¶ 25; RFOF ¶ 88. Thus, 3M knew that the pressure drop was important to the effectiveness of the mask because it was directly related to face seal leakage and was not merely a comfort issue.

> **2.**  **3M was required by NIOSH, USBM, and its own Quality Assurance Manual to routinely conduct the silica dust test on the 8710 to ensure compliance with NIOSH/USBM requirements for penetration and pressure drop.**

In 1972, 30 C.F.R. § 11 was enacted to regulate the certification of respirators to be used in all industries. PAFF ¶¶ 1-6, 29. In order to be certified as a single-use respirator for pneumoconiosis producing dusts under 30 C.F.R. § 11, 3M was required by NIOSH and USBM to meet certain criteria. Most importantly, 3M was required to pass the silica dust test for both penetration and pressure drop (also known as breathing resistance). PAFF ¶¶ 7-15.

The silica dust test required conditions that reproduced the humidity and temperature of human breath, which was important because a single use respirator like the 8710 did not have inhalation or exhalation valves or any internal structure to prevent the exhaled breath from passing back through the filter media. PAFF ¶¶ 3-4, 16-20. It was important that the 8710 pass the pressure drop test in order to prevent face seal leakage. PAFF ¶¶ 21-26; RFOF ¶ 88. As single use particulate filter respirators like the 8710 are used, a filter cake forms on the mask causing an increase in pressure drop, which subsequently increases the rate at which the face seal leaks. PAFF ¶¶ 21-26; RFOF ¶ 88.

NIOSH/USBM expressly required that respirators approved under 30 C.F.R. § 11 be maintained in a condition which is the same in all aspects as respirators that were initially approved. PAFF ¶¶ 6-11. As part of its certification, 3M was also required to submit for approval a quality control plan that ensured the 8710 was being manufactured according to the specifications under which it initially obtained approval; this quality control plan included the silica dust test.

PAFF ¶¶ 8-11, 36.  As a result, 3M's quality control plan required that they conduct routine testing of the 8710 to ensure it met NIOSH/USBM specifications for pressure drop under the silica dust test.  PAFF ¶ 26; RFOF ¶¶ 82-83.

3M itself stressed the importance of the silica dust test.  In April of 1975, 3M admitted that the "silica dust test is the ultimate determination of acceptability," because the "test measures some things that the DOP machine does not."  PAFF ¶ 65; RFOF ¶ 82.  Furthermore, in July of 1979, 3M stated that the silica dust machine is "the most important test in the plant," and that it should "play a more important roll [sic] in the release testing of the government approved product lines," such as the 8710.  PAFF ¶ 87; RFOF ¶ 83.

NIOSH/USBM reserved the right to revoke any certification of approval where it found that the applicant's quality control test methods, equipment, or records did not insure effective quality control over the respirator.  PAFF ¶ 14; RFOF ¶ 84.  Thus, 3M was required not only by NIOSH and USBM, but by its own quality control manual to regularly conduct the silica dust test on its 8710 respirators to ensure they were being produced in accordance with NIOSH/USBM specifications.  Futhermore, 3M was required to notify NIOSH/USBM of any problems in maintaining such quality.  PAFF ¶¶ 15, 24, 36; RFOF ¶¶ 83-84.

> 3.  <u>3M did not communicate to NIOSH/USBM that the 8710 respirator routinely and consistently failed NIOSH/USBM requirements for pressure drop under the silica dust test.</u>

In order to achieve certification for a single use dust respirator, NIOSH/USBM required 3M to pass the silica dust test for penetration as well as inhalation and exhalation resistance, also known as pressure drop.  PAFF ¶¶ 16-20.  NIOSH/USBM required that the conditions of the silica dust test to reproduce, as close as possible, the normal conditions of human breath.  PAFF ¶¶ 3-4, 16-20.  Before 30 C.F.R. § 11 was enacted, 3M complained that the silica dust test was too difficult a test to meet because the humidity was too high, which resulted in the 3M 8710 failing the silica

13

dust test for pressure drop during preliminary testing.  PAFF ¶¶ 27-31.  As a result, 3M petitioned NIOSH to raise the permissible pressure drop from 15 mm to 20 mm.  PAFF ¶ 32.  NIOSH refused to raise the pressure drop limit and kept it at 15 mm.  PAFF ¶ 33.

3M was admittedly under a great deal of pressure to get the 8710 mask certified because prior to the passage of 30 C.F.R. § 11 in 1972, there were no regulations that governed the certification of single use respirators like the 8710 mask.  PAFF ¶¶ 29-30.  Moreover, because OSHA was requiring that every industry that uses a respirator to use a NIOSH/USBM certified respirator, 3M was anxious to obtain approval from NIOSH/USBM otherwise it could not sell the 8710 mask.  PAFF ¶¶ 29-30.

3M's argument that NIOSH/USBM altered its silica dust test is irrelevant to the defectiveness of the 8710 mask for two reasons:  (1) regardless of the change, 3M was required to pass the silica dust test under the NIOSH/USBM's specifications, thus if NIOSH/USBM altered its test, 3M was required to satisfy the new test; and (2) the 3M 8710 could not meet NIOSH/USBM specifications for pressure drop at any point before or after NIOSH/USBM certification.

The only evidence there was a change to the silica dust test was a letter from NIOSH advising 3M to adjust the relative humidity of the test chamber to avoid erratic leakages.  RFOF ¶ 82.  NIOSH advised 3M that once it adjusted its silica dust test to be in accord with NIOSH's specification that NIOSH would work with 3M to cross check the results.  RFOF ¶ 82.  Thus, it did not matter that NIOSH made changes to its silica dust test procedure because 3M was still required to adjust their test to be within the required NIOSH specifications.  RFOF ¶ 82.

Even if NIOSH made changes to its silica dust test, those changes were irrelevant because 3M could not pass the pressure drop requirements before it was certified.  PAFF ¶ 31; RFOF ¶ 82.

Test results from 1971, the year before it was certified, demonstrate that the 8710 mask was failing the pressure drop requirements under the silica dust test.  PAFF ¶ 31; RFOF ¶ 82.  Moreover, 3M blamed this failure on changes to NIOSH's breathing machine, suggesting the alleged "changes to the silica dust test procedure," occurred before the 3M 8710 was even certified.  PAFF ¶ 31; RFOF ¶ 82.

Although the 3M 8710 was certified by NIOSH and USBM in May of 1972, in June of 1972, less than a month after it was certified, 3M reported it was producing lots of the 8710 mask that did not meet NIOSH/USBM requirements.  PAFF ¶¶ 40-42.  Indeed, as the following timeline will show, the 3M 8710 respirator consistently failed the pressure drop requirements under the silica dust test from the year before it was certified until the 1980s when it altered the humidity conditions of its silica dust test:

- June 30, 1971:  3M reports its single use respirator was not meeting NIOSH requirements and blames it on NIOSH's machine behaving differently.  PAFF ¶ 31.

- May 24, 1972:  Bureau of Mines approves the 3M 8710 mask as a "single use air purifying respirator" for protection against pneumoconiosis producing dusts such as asbestos.  PAFF ¶ 40.

- June 11, 1972:  3M reports producing lots of the 8710 that did not meet NIOSH requirements for final pressure drop.  PAFF ¶ 42.

- September 25, 1972:  3M reports the 8710 respirators had been exceeding the pressure drop limits since the beginning of production.  PAFF ¶ 43.

- September 6, 1973:  3M continued to produce and sell the 8710 with unacceptable final pressure drop results and admits it is "gambling by using the web in full production," but nonetheless continued to do so.  PAFF ¶ 47.

15

– October 18, 1973:  3M reports continuing problems maintaining a consistently acceptable pressure drop and samples were "unacceptable high in final pressure drop."  PAFF ¶ 548.  All test equipment was thoroughly checked so data was considered valid.  PAFF ¶ 48.  3M admits the process is out of control and was considered a severe problem, but 3M continued to release the product for sale.  PAFF ¶ 49.

– March 7, 1974:  3M reports concern that NIOSH could challenge the 8710 respirator certification because ti continued to be significantly off specification in final pressure drop.  PAFF ¶ 52.

– March 22, 1974:  3M reports the final pressure drop on the 8710 mask was outside the specifications that NIOSH approved, that this was a major defect problem, and that the 8710 has "really never been very safe in regard to [final pressure drop]."  PAFF ¶ 53.  3M admitted that if NIOSH tested the 8710 as it existed that day, it would have been rejected for certification.  PAFF ¶ 54.

– March 29, 1974:  3M admits that it cannot submit the 8710 or the redesigned 8710A mask for NIOSH certification because the final pressure drop was excessive.  PAFF ¶ 55.

– January 16 & 27, 1975:  3M reports the final pressur drop for the 8710 under the silican dusttest were at their highest with more than 50% of the production of the 8710 failing.  PAFF ¶ 61.

– April 17, 1975:  As part of its post-certification surveillance, NIOSH did an audit of the 3M 8710 respirator and found that the results of the final pressure were too

16

high and advised 3M to bring the pressure drop back under control.  PAFF ¶ 63.
3M blames this result on NIOSH's own test changes.  PAFF ¶ 64.

–   June 25, 1975:  3M admits that there is nothing technically it could do to get the
8710 under 15 mm for the pressure drop.  PAFF ¶ 66.

–   June 30, 1975:  3M reports continued failure in lowering the final pressure drop in
the 8710 respirators.  PAFF ¶¶ 70-71.

–   July 22, 1975:  3M determines that the 8710 "performance cannot be improved
without major design change," and that the redesigned 8710-H failed NIOSH tests.
PAFF ¶ 72.

–   June 17, 1976:  3M holds meetings to determine an initial course of action for
dealing with the pressure drop problem in the 8710.  PAFF ¶ 73.

–   September 28, 1976:  3M reports that only 44.8% of the 8710 production would be
acceptable for silica dust penetration, 0.5% would be acceptable for final inhalation
pressure drop, and 26.1% would be acceptable for final exhalation pressure drop.
PAFF ¶ 74.  3M admits that these results "are not new."  PAFF ¶ 77.

–   October 1, 1976:  3M reports the 8710 respirator still did not pass NIOSH standards
because the pressure drop increase was too high.  PAFF ¶ 78.

–   November 19, 1976:  NIOSH notifies 3M that its request for an extension of
approval for the redesigned 8710 was denied because it did not meet the pressure
drop and penetration requirements.  PAFF ¶ 83.

–   Data from 1976, 1977, 1978, 1979, and 1980 reveals that the 3M 8710 did not even
come close to meeting the silica dust test requirements for NIOSH approval.  PAFF
¶ 84.

    −       January 30, 1979:  3M reports the 8710 was still testing over the allowable final pressure drop limit.  PAFF ¶ 86.

    −       April 3, 1980:  3M reports that out of four lots of 8710 respirators, only one lot met all single use requirements and that the other three lots failed NIOSH requirements, but all lots were released for sale.  PAFF ¶ 88.

    −       October 23, 1981:  3M reports that at least 50% of the 8710 product line continued to exceed 15 mm on final pressure drop.  PAFF ¶ 92.

    −       November 3, 1981:  3M reports that the 8710 continued to fail the final pressure drop for the silica dust test and that the breathing machine final exhalation pressure drop remained "out of control."  PAFF ¶ 93.

Thus, from 1971, the year before it was certified, until 1981, the 3M 8710 was reported to be consistently failing NIOSH specifications for final pressure drop under the silica dust test. RFOF ¶ 85.  The only reason the reported failures of the 8710 stopped after 1981 is because 3M instituted a change in the humidity of the breathing machine chamber, which resulted in 8710 finally meeting pressure drop requirements.  PAFF ¶¶ 89-98.  However, this is beyond the timeframe for the Weyerhaeuser facility because Weyerhaeuser ceased the use of asbestos in 1978 or 1979, obviating the need for its workers to use the 3M 8710.  PAFF ¶ 102; RFOF ¶ 11.

Thus, despite its "certification" and 3M's repeated representations, it is clear from the evidence that the 3M 8710 respirator was never able to consistently pass the pressure drop requirements under the silica dust test.  This information was never conveyed to NIOSH or USBM as required by 30 C.F.R. § 11.  PAFF ¶¶ 42, 56, 62, 64, 67, 78, 82.  In fact, when NIOSH/USBM tested the 3M 8710 as part of its ongoing audit process and discovered it failed the pressure drop test, 3M blamed the failure on NIOSH/USBM's own testing conditions knowing full well that

18

3M's own internal tests were obtaining the same results.  PAFF ¶¶ 63-64.  The only way 3M was able to avoid revocation of its certification was to "negotiate" with NIOSH.  PAFF ¶¶ 66-68.  Additionally, 3M continued to submit the 8710 for extended approval multiple times even though it knew it was not meeting NIOSH specifications.  PAFF ¶¶ 55-58, 83, 85.

As part of the NIOSH required quality control plan required for certification, 3M asked NIOSH to accept a substitute test method for the silica dust test because the test as prescribed by 30 C.F.R. § 11 was, according to 3M, slow and costly.  PAFF ¶ 37.  This substitute method was called the DOP test, and in its application for approval, 3M represented that the results of the quicker and cheaper DOP test correlated with the results of the silica dust test for penetration and pressure drop.  PAFF ¶ 38.  The data and documentation submitted by 3M in support of this correlation was minimal and misleading for this type of quality assurance test substitution.  PAFF ¶¶ 39, 44.  Again, as the following timeline will show, 3M was aware soon after approval that the DOP test did not correlate with the silica dust test for pressure drop and, thus, was not a good predictor of whether the masks would pass under the silica dust test:

   −   May 24, 1972:  Bureau of Mines approves the 3M 8710 mask, a "single use air purifying respirator," for protection against pneumoconiosis producing dusts such as asbestos.  PAFF ¶ 40.  3M's approved quality control manual requires the silica dust test, as prescribed under 30 C.F.R. § 11.  PAFF ¶ 36.

   −   December 6, 1972:  USBM/NIOSH approves the substitution of the DOP test for the quality control program based on 3M's representations regarding the correlation between the silica dust test and the DOP test.  PAFF ¶¶ 45-46.

−   October 18, 1973:  Less than a year after approval, 3M reports that the original correlation between the silica dust test and the DOP test "is no longer valid," but continues to release the 8710 for sale.  PAFF ¶¶ 50-51.

−   July 23, 1974:  3M did not inform NIOSH of its finding that the correlation is not valid; instead, it submits for extension of approval a newly designed 8710 and requested permission to substitute the DOP penetration and pressure test for the silica dust test.  PAFF ¶¶ 56-57.

−   September 6, 1974:  Based on the data submitted by 3M, NIOSH approves the correlation of the DOP and silica dust tests, but reminds 3M that the DOP test is for "production information only," that the silica dust test was still the required test for respirator approval under 30 C.F.R. § 11, and that "if there is ever a conflict in results between the two methods, the silica dust test will be the reference method." PAFF ¶¶ 59-60.

−   January 16 & 27, 1975:  3M reports that the silica dust test and DOP test are reporting opposite results, which leads 3M to conclude that there is no correlation between the DOP test and the silica dust test with regards to pressure drop.  PAFF ¶ 62.

−   September 28, 1976:  3M reports that the "DOP testing has very little if any correlation with final pressure drop tests after silica dust exposure."  PAFF ¶¶ 75-77.  Moreover, 3M admits that this lack of correlation is "not new."  PAFF ¶ 77, 79.

−   October 1, 1976:  3M reports that there is still no real correlation for pressure drop between the DOP test and the silica dust test.  PAFF ¶ 81.

20

Since the silica dust test and the DOP test correlations were repeatedly declared invalid after 1973 by 3M's own quality control managers, it was incumbent on 3M to inform NIOSH and cease using the DOP test as a quality control for production of the 8710.  PAFF ¶ 82.  There is no evidence that 3M ever informed NIOSH of the lack of correlation between the DOP substitute test and the NIOSH required silica dust test.   PAFF ¶¶ 78.   The evidence stated above clearly demonstrates that the 3M 8710 mask was defective because it consistently did not meet NIOSH requirements for pressure drop under the silica dust test and the substitute DOP test was repeatedly declared invalid after 1973.

There were other alternative designs of respirators that were available at the time that met NIOSH certifications.  In a Weyerhaeuser internal memo from 1973, Joseph Wendlick presented 12 other commercially available respirators, other than the 3M 8710, that met NIOSH certification requireemnts.   RFOF ¶ 62.   3M could have produced a respirator that actually met NIOSH certification requirements, or at the very least informed NIOSH/USBM of the 8710's repeated failure to pass the pressure drop requirement of the silica dust test (which would have canceled its certification).

4.   The law of rebuttable presumptions.

As explained in *Hall v. Boston Scientific Corp.*, 2015 WL 874760 (S.D.W.V.), to rebut the presumption of § 895.047(3)(b), the Plaintiff only needs to establish an issue of fact that the product was defectively designed.  *Id.* at *4.  In the case at bar, Plaintiffs have more than created an issue of fact that the 8710 did not comply with relevant specifications.

Rule 301 of the Federal Rules of Evidence provides in pertinent part:  "In a civil case . . . the party against whom a presumption is being directed has the burden of producing evidence to rebut the presumption."  Fed. R. Evid. 301.  Rule 302 provides:  "In a civil case, state law governs

the effect of a presumption regarding the claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 302.  Therefore, we turn to Wisconsin Statute § 903.01, which provides:

> [A] presumption recognized at common law or created by a statute . . . imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

Wis. Stat. § 903.01.  As both the Judicial Council Committee Note to § 903.01 and the Wisconsin Supreme Court case law explain, "Presumptions are applied to compel the production of evidence, if any exists***' *Hanson v. Engebretson*, 239 Wis. 126, 133, 294 N.W. 871, 820 (1941)."  Judicial Council Committee's Note to § 903.01 (2d paragraph).

Here, Plaintiffs have come forth with a substantial amount of evidence, and almost all of it is from 3M's own internal memoranda and correspondence that was produced in discovery in this litigation.

### C.    The 8710 Did Not Meet Consumer Expectations of Safety

3M argues that the 8710 mask met consumer expectations of safety.  Part of 3M's argument is that Weyerhaeuser was aware that the 3M 8710 respirators did not provide absolute protection against asbestos but proceeded to use them anyway.  3M memo at 21-22.  3M warranted that the 8710 mask met NIOSH certification.  This meant a single use respirator, so certified, would protect people up to ten times the PEL for asbestos.  PAFF ¶ 99.  Weyerhaeuser utilized the 8710 based on this representation and because its own testing suggested that some masks did protect up to ten times the PEL.  RFOF ¶ 60.

In reality, 3M's own testing revealed that the 8710 mask only achieved at best a protection factor of 3.  RFOF ¶ 87.  A 1976 publication by Edwin Hyatt, titled "Respirator Protection Factors," identified the 3M 8710 as a single use dust respirator with only 25% of a 16-man test panel obtaining a protection factor of greater than 10.  RFOF ¶ 19.  He ultimately assigned the

22

single use dust respirator a protection factor of 5.   RFOF ¶ 19.   As 3M stated, a manufacturer is strictly liable where the product is, "at the time it lease the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him."   3M memo at 23 (citing Restatement (Second) of Torts § 402A cmt. G (1965)).   It is axiomatic that (1) a respirator marketed to comply with NIOSH certification, when it does not meet the standards for certification, is not what the objective consumer would expect; and (2) a respirator that is marketed to protect against asbestos fibers with a protection factor of ten, but in fact does not provide such protection factor, is not what the objective consumer would expect.

Therefore, the 3M 8710 mask did not meet Weyerhaeuser's expectations that it truly met NIOSH certification standards and, thus, would provide a protection factor of ten times the PEL. No one would expect the 8710 to be sold despite the fact that it continuously failed NIOSH certification requirements.

### D.  Negligence Claims Against 3M

Plaintiffs also assert negligence claims against 3M.  The basis for 3M's summary judgment motion on the negligence count is the alleged "sophisticated user" defense.  3M's sole discussion on negligence liability is:

> Since Plaintiff's negligence claims fail because the 8710 was not defective and Weyerhaeuser was a sophisticated user (negating 3M's duty to warn Decedent), Plaintiffs' "failure to warn" strict liability claim must also fail.  As Plaintiffs can off no evidence that the 3M respirators allegedly at issue were defective, both the strict liability and negligence claims must be dismissed in their entirety.

3M memo at 25.

Plaintiffs' allegations of negligence in the Second Amended Complaint include:

84.   Plaintiffs bring this claim for negligence against defendant 3M

. . .

23

88.     Defendant represented or held out the masks to be adequate in the protection against inhalation of asbestos fibers during the type of operations at the Marshfield plant.

89.     The masks did not properly protect against inhalation of asbestos fibers from the operations at the Marshfield facility.

90.     Defendant had a duty to exercise reasonable care for the safety of Plaintiff and others who used defendant's personal protective equipment . . .

Wisconsin law is very clear on negligence.   One has to refrain from actions that unreasonably threaten the safety of others.

As the Wisconsin Supreme Court held:

As a starting point of a negligence analysis, we recognize in Wisconsin that everyone has a duty to act with reasonable and ordinary care under the circumstances.   [Citation omitted]   This first element, a duty of care, is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission might cause harm to some person.

Our state's recognition of a general duty to act with ordinary care . . . is that everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. . . . This general duty has also been described as an obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person . . . is unknown at the time of the act.

*Hornback v. Archdiose of Milwaukee*, 313 Wis. 2d 294, 752 N.W.2d 862, 869 (2008) (internal quotations and brackets omitted).

Clearly, it is foreseeable that selling masks to protect from harmful levels of asbestos and representing the masks were NIOSH certified (when 3M knew the 8710 did not meet NIOSH certifications criteria and thus did not provide the protection it claimed) would cause harm to those who wear the masks in reliance upon such representations.

**E.     Punitive Damages**

3M's argument to strike punitive damages is essentially the same for arguing no defect in the 8710.  As 3M argues, "the 3M 8710 Respirator maintained uninterrupted NIOSH certification

24

from 1972 until 1998 and is presumed under Wisconsin law not to be defective."  3M's memo at p. 26.

Plaintiffs agree with 3M that the standard for awarding punitive damages under Wisconsin law is evidence showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.  3M Memo at p. 25.  The operative statute is Wis. Stat. § 895.043.  Its' predecessor statute was enacted in 1995.  *Strenke v. Hogner*, 279 Wis. 52, 694 N.W.2d 296, 300 (2005).  In *Strenke*, the Wisconsin Supreme Court held that an "intentional disregard of the rights of the plaintiff" occurs when:

> The person acts with a purpose to disregard the plaintiff's rights <u>or</u> is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded.  This will require the course of conduct be deliberate.  Additionally, the act or conduct must actually disregard the rights of the plaintiff, whether it be the right to safety, health or life . . . or some other right.

*Id.* at 304-05.

Here, 3M intentionally sold 8710 masks that it knew did not comply with NIOSH certification standards.  Additionally, in order to produce test results that showed the 8710 mask satisfying NIOSH certification standards, 3M modified its breathing test humidity, thus, essentially producing false results.  PAFF ¶¶ 93-106.  This intentionally violated Elvira Kilty's right to health and safety.

*Strenke* also held that the punitive conduct need not be directed to a "specific plaintiff." *Id.* at 307.  Finally, *Strenke* held that punitive damages are allowed even if the defendant did not intend to cause injury.  *Id.* at 302.

In the products liability arena, Plaintiffs agree with 3M, that this punitive standard is met when:

> After having gained specific knowledge of a product's defect and its potential harm, the manufacturer fails to take some action that the defect demands, such as adequate testing procedures, effective quality control, sufficient warnings, or adequate

> remedial measures such as product recalls or post-sale warnings.  [Citation omitted]
> The Wisconsin Supreme Court held punitive damages were permissible in a
> products liability case where the plaintiff alleged the defendant knew of the defects
> in the design of its product based on testing it had conducted and where the
> defendant deliberately chose not to issue warnings.

3M Memo at p. 26.

Here, 3M's testing gave it actual notice its 8710 did not give a Protection Factor of ten, did not meet NIOSH certification testing for pressure drop, yet 3M deliberately sold the 8710 for use with asbestos in environments up to ten times the PEL.  Moreover, 3M never notified NIOSH of its failures to satisfy certification requirements and even resorted to modifying the breathing chamber humidity levels in order to submit data that showed results within certification requirements.  PAFF ¶¶ 89-98.  3M was well aware of the importance of testing the 8710 at high humidity as they had been advised by NIOSH several times of this importance.  PAFF ¶¶ 60, 90.  As a result, these results that do not show that the masks are being tested at NIOSH-specified humidity levels are invalid as they do not comport with NIOSH's specific requirements.  PAFF ¶¶ 95-98.

This is classic punitive conduct.  Plaintiffs respectfully request that this Court deny 3M's motion with respect to punitive damages.

26

## III.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that 3M Company's Motion for

Summary Judgment be denied.

DATED:  March 9, 2018

Respectfully submitted,

/s/Meredith K. Clark
JOHN E. HERRICK
NATHAN D. FINCH
MEREDITH K. CLARK
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

Attorneys for Plaintiffs

27

## **CERTIFICATE OF FILING**

I hereby certify that on March 9, 2018, I electronically filed the foregoing with the Clerk

of Court using the ECF system which will send notification of such filing to all counsel of record.

ATTORNEY FOR PLAINTIFF

/s/Meredith K. Clark_____
Meredith K. Clark
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29264
(843) 216-9000