IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PAMELA KILTY, individually and as
Special Administrator of the Estate of
Elvira Kilty, PAUL J. KILTY, DAVID
L. KILTY, WILLIAM J. KILTY and
JAMES S. KILTY,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION AND ORDER |
| v. | | 16-cv-515-wmc |

WEYERHAEUSER COMPANY, 3M COMPANY,
and METROPOLITAN LIFE INSURANCE
COMPANY,

Defendants.

-------------------------------------------------------------------------------------------------------------------------

SCOTT SPATZ, individually and as
Special Administrator of the Estate of
Herbert Spatz,

|  |  |  |
|---|---|---|
| | Plaintiff, | |
| v. | | 16-cv-726-wmc |

WEYERHAEUSER COMPANY, 3M COMPANY,
and METROPOLITAN LIFE INSURANCE
COMPANY,

Defendants.

Plaintiffs, the estates and family members of two former employees of defendant

Weyerhaeuser Company, assert negligence claims against Weyerhaeuser based on non-

occupational community and household exposure to asbestos fibers emitted from a

Weyerhaeuser manufacturing facility.  These two cases are the second wave of asbestos-

related claims asserted against Weyerhaeuser in this court.  Pending among other matters

are Weyerhaeuser's motions for summary judgment and related motions, challenging

plaintiffs' evidence of causation, particularly their experts' testimony.  In the first wave of cases, the court considered virtually the same challenges and established a framework for considering the reliability of expert testimony, the causation requirement and the necessary evidence to survive summary judgment.  *See Boyer v. Weyerhaeuser Co.*, No. 12-CV-899-WMC, 2016 WL 705233, at *1 (W.D. Wis. Feb. 19, 2016).  The Seventh Circuit Court of Appeals reviewed and affirmed that decision, albeit criticizing treatment of plaintiff experts' opinion testimony as too "deferential."  *Pecher v. Owens-Illinois, Inc.*, 859 F.3d 396, 400 (7th Cir. 2017) ("This admission under Rule 702 seems overly deferential to a highly dubious theory of harm, but neither this nor the exclusion of the same testimony with respect to the three plaintiffs on appeal could be considered an abuse of discretion.").

With this case law in mind, the court will grant both of defendant's summary judgment motions here, finding that even under its more generous view of the admissibility of expert testimony, plaintiffs have failed to offer sufficient evidence for a reasonable jury to find that their non-occupational exposure to asbestos constituted a substantial contributing factor to plaintiffs' mesothelioma diagnoses.  As such, the court will direct entry of judgment in defendant Weyerhaeuser's favor.[1]

---

[1] Having granted Weyerhaeuser judgment, its motion to stay proceedings pending an interlocutory appeal of the court's decision denying Weyerhaeuser's motion to dismiss plaintiffs' claim as barred by the exclusivity provision of Wisconsin's Workers Compensation Act is moot, as it its related motion to file a reply brief in support of the stay and defendant 3M's motion to join Weyerhaeuser's motion to stay.  ('515 dkt. ##284, 288, 289; '726 dkt. ##235, 239, 240.)

PRELIMINARY ISSUES

Before turning to the merits of Weyerhaeuser's motions for summary judgment, the court must first take up a number of preliminary matters.

**A. Appeal of Judge Crocker's Discovery Order**

First, plaintiffs appeal from a discovery order by Magistrate Judge Crocker, which (1) denied their motion for leave to depose two witnesses, Richard Luther and Charles Reno, after the close of discovery, and (2) shifted defendant's costs in opposing that motion to plaintiffs as a sanction pursuant to Federal Rule of Civil Procedure 37(a)(5)(B).  (3/7/18 Order ('515 dkt. #199; '726 dkt. #151); 3/22/18 Order ('515 dkt. #249; '726 dkt. #204); Pls.' Rule 72 Objs. ('515 dkt. #242; '726 dkt. #200).)  In their respective Rule 26(a)(1) disclosures, served on October 31, 2017, plaintiffs disclosed as a category of witnesses "Weyerhaeuser Site Workers," indicating they may have discovery information on a variety of topics.  (Kilty's Rule 26(a)(1) Disclosures ('515 dkt. #59) ¶ A.7; Spatz's Rule 26(a)(1) Disclosures ('726 dkt. #48) ¶ A.7.)  At the time, plaintiffs also attached as Exhibit A a list of 118 such witnesses, including Luther and Reno.  (*Id.* at Ex. A.)

Defendants did not object to this initial disclosure, but as far as the court can discern from the parties' submissions, that was in reliance on plaintiffs' counsel following the usual practice in other asbestos cases of winnowing down similar lists by noticing certain witnesses for deposition.  However, on December 21, 2017, counsel for Weyerhaeuser docketed a letter to Judge Crocker apprising him of a discovery dispute concerning plaintiffs' counsel's unwillingness to name site workers that they intended to notice for depositions.  At its crux, counsel for Weyerhaeuser complained that plaintiffs were insisting

3

that defendants provide possible dates for depositions before plaintiffs would designate approximately 15 Site Workers for depositions.[2]  In response to counsel's letter, Judge Crocker first reprimanded Weyerhaeuser's counsel for submitting a letter, rather than a motion, but nonetheless entered an order on December 22, 2017, advising "if a party has specific witnesses in mind to depose but fails or refuses promptly to identify those witnesses to opposing counsel as required under Rule 26(a)(1)(A)(i) or in response to opposing counsel's request, then that party has violated the preliminary pretrial conference order and is subject to sanctions under Rule 37(b)."  (12/22/17 Order (dkt. #77).)  Despite this admonition, plaintiffs still failed to provide defendants with names of site workers for deposition.

In January, Weyerhaeuser provided dates for early February, affirmatively noticing itself five site workers for depositions, with 3M adding six more.  On February 6, 2018, during one of those depositions, plaintiffs' counsel indicated that "there are additional depositions that are going to have to be scheduled in Marshfield . . . . I have co-workers that I need to call."  (Koepke Depo. (dkt. #148) 160-61.)  Weyerhaeuser's counsel reminded plaintiffs of Judge Crocker's order and preserved its objections.  (*Id.* at 160-61, 192.)

---

[2] Plaintiffs concede as much in their appeal to this court, representing that "[t]he practice usually followed in the Marshfield cases is to agree to dates for coworker depositions in advance . . . [and o]nce dates are agreed upon, the persons to be deposed are determined and notices issued."  (Pls.' Rule 72 Objs. (dkt. #242) 5.)  Unless otherwise noted, all references to the docket are to Case No. 16-cv-515.

On February 16, 2018, the deadline for the parties to file summary judgment motions, plaintiffs first noticed Luther's deposition for February 28, 2018, which was the date for the close of discovery in this case.  On February 22, 2018, plaintiffs' counsel informed defendants that it also intended to depose Charles Reno that same day.  Plaintiffs represent that health issues with both deponents, however, prevented either depositions from actually going forward on February 28.  As a result, plaintiffs filed a motion for leave to take the depositions of both after the close of discovery.  In their motion, they argued that since both were properly disclosed in their October 31, 2017, Rule 26 initial disclosures, albeit as one of 181 site workers, and that their February 16, 2018, notice of Luther and February 22, 2018, email regarding Reno were timely, they did not violate the court's December 22, 2017, order, particularly since both were identified as soon as plaintiffs had a "specific witness in mind to depose."  (Pls.' Mot. (dkt. #192) 6-7.)

On March 7, Judge Crocker denied plaintiffs' motion, concluding that "[p]laintiffs did not properly disclose the identities of these two witnesses to defendant in a fair, timely or useable fashion, [and] then plaintiffs waited until the last minute to attempt to squeeze in these depositions.  This violates the preliminary pretrial conference order in each case and violates this court's December 22, 2017 text-only order."  (3/7/18 Order (dkt. #199).)  The court also sanctioned plaintiffs pursuant to Rule 37, directing defendants to submit their itemized statements of fees and costs, subsequently concluding that the requested amounts were reasonable and plaintiffs' motions were not substantially justified.  Judge Crocker stayed the actual payment of those costs until after this court ruled on the present Rule 72 objections.  (*Id.*; 3/22/18 Order (dkt. #249).)

This court will now affirm Judge Crocker's order denying plaintiffs' motion for leave to take depositions after the close of discovery, but will vacate the part of his order sanctioning plaintiffs, finding that plaintiffs did not clearly disobey the letter of the court's preliminary pretrial conference order nor Judge Crocker's December 22, 2017, order. While the court finds that Luther and Reno were included in plaintiffs' initial disclosures, plaintiffs broad categories of discovery topics for which these 181 site workers may have information is unworkable.  However, defendants did not object to this initial disclosure. Instead, defendants focused their efforts on pushing for a narrowed list of site workers to be deposed; and when plaintiffs failed to identify any site workers in a timely fashion, defendant brought their concerns to Judge Crocker in a December 21 letter.  In his December 22 order, Judge Crocker then expressly instructed plaintiffs to identify promptly witnesses for depositions once they had "specific witnesses in mind to depose."

For whatever reason, whether gamesmanship as defendants contend or simple inattention, plaintiffs gambled on delaying until the last minute, naming two witnesses near the close of discovery, and leaving no wiggle room to ensure that the depositions would be completed before the end of discovery.  This gamble did not pay off.  Plaintiffs were warned, told to act diligently, and as is typical for plaintiffs' counsel in these cases, failed to do so.  Judge Crocker rightly chose not to bail plaintiffs' counsel out and neither will this court if for no other reason than to deter such gamesmanship or lack of diligence in the future.

Still, the question remains whether plaintiffs' failure to act sooner violated a prior order of this court and warranted a sanction under Federal Rule of Civil Procedure

37(b)(2)(A).  Certainly, plaintiffs flouted the spirit of Judge Crocker's December 22nd order if not the letter, but the express language of the order required plaintiffs to disclose specific witness when they had them "in mind to depose."  (3/7/18 Order (dkt. #199).)  This order is sufficiently ambiguous to foreclose a finding that plaintiffs disobeyed a court order. Instead, the appropriate "sanction" is to deny plaintiffs' request to extend the discovery deadline with respect to these two late-noticed depositions.

This leaves one final issue unanswered.  Weyerhaeuser construes Judge Crocker's March 7, 2018, order denying plaintiffs leave to depose Luther and Reno as excluding them as witnesses, and thus urges the court to strike their declarations submitted in opposition to summary judgment.  (*See* Weyerhaeuser's Mot. to Strike (dkt. #256) 5-15.)  Since the March 7 order does not expressly address this issue and defendants themselves did not object to plaintiffs' Rule 26(a)(3) disclosure of 181 site workers, and instead simply challenged plaintiffs' failure to identify timely witnesses for depositions, striking Luther's and Reno's declarations all together, much less their testimony at trial (were they able to be subpoenaed or willing to appear voluntarily) seems overly harsh, unless there were evidence that plaintiffs have actually had them "in mind to depose" or to call at trial well before they were named.  For reasons explained more fully below, however, the court need not pursue such evidence, since the declarations do not substantially aid plaintiffs' ability to demonstrate a causal link between plaintiffs' alleged non-occupational exposure to asbestos and their respective mesothelioma diagnoses.  As such, while the court considered the declarations, they ultimately do not preclude summary judgment in defendant's favor, mooting any need to exclude their testimony.

## B. Weyerhaeuser's Motion to Exclude Evidence

### i.   Schiller Deposition

Weyerhaeuser next seeks to strike the deposition of Elwood Schiller, which was taken in another proceeding in which Weyerhaeuser was not a party.  As the court explained in the *Boyer* summary judgment opinion, the Schiller deposition does not fit within the contours of Federal Rule of Evidence 804(b) and therefore constitutes hearsay. *Boyer*, 2016 WL 705233, at *4.  The court sees no reason to reconsider this ruling on the facts here, and therefore will exclude the Schiller deposition as inadmissible hearsay.

### ii.   Anderson Affidavits

Defendant Weyerhaeuser also seeks to exclude two affidavits executed by plaintiffs' expert, Dr. Henry Anderson, in 2010 and 2011 in what defendant describes as "other, unrelated cases."  (Def.'s Mot. to Strike (dkt. #256) 3.)  These affidavits were filed in the first wave of Weyerhaeuser asbestos cases, and cited by Anderson in the reports specific to these two cases.  (*See* Pl.'s Opp'n (dkt. #275) 3.)  The court sees no basis to strike them from consideration on summary judgment and will not do so.

### iii.   D.B. Allen Memo

Finally, touching on another familiar topic, Weyerhaeuser seeks to exclude the "D. B. Allen memorandum."  The court will deny this motion, for the reasons described in earlier opinions, finding that plaintiffs' laid a sufficient foundation to authenticate Allen's memorandum through his deposition testimony.  (*See* Pls.' Opp'n (dkt. #275) 33-34.)  The court, however, will limit Allen's use of the memorandum, disregarding as hearsay the truth of any statements as to what members of the community reported.

8

UNDISPUTED FACTS[3]

**A. Background**

Plaintiff Weyerhaeuser acquired a manufacturing facility located in Marshfield, Wisconsin, from Roddis in 1960 and sold it in 2000.[4]   The Marshfield facility manufactured wood products with multiple operations and divisions on site, including a dry kiln, particleboard plant, molded products plant, warehouse, a door factory mill, and a mineral core plant.  Beginning in 1968, Weyerhaeuser manufactured a door "core" that contained asbestos in the mineral core plant, which was a stand-alone building in the Marshfield facility.  By 1971, production in the mineral core plant was at full capacity, producing approximately 5500 cores per week, all containing asbestos.  Weyerhaeuser stopped using asbestos in June 1978.

Before 1968, Weyerhaeuser also used asbestos products, but had not manufactured or otherwise used it in a raw form in its products until then.  Asbestos cores used in the manufacture of fireproof doors were purchased before 1968 from outside vendors.  For example, from 1954 to 1956, Weyerhaeuser manufactured a fireproof door using an "asbestocore material."  (Def.'s PFOFs (dkt. #258) ¶ 28.)  Beginning in 1959 and continuing to 1972, Weyerhaeuser also manufactured a fireproof door with a preformed, asbestos-containing core called "Kaylo."

---

[3] For the purposes of deciding the present motion, unless otherwise noted, the court finds the following facts undisputed and material.

[4] For ease of reference, the court also uses "Weyerhaeuser" to refer to the entity that historically operated and manufactured products containing asbestos at the Marshfield plant.

As for the layout of the site, the door factory mill or plant, was a multistory building that contained various operations.  In the basement was a veneer dry clipping area; the first floor included the veneer mill on the south end and the core mill was on the north end, which is where the doors were first assembled.  Before 1968, when the asbestos cores began to be manufactured onsite, all processing of the third-party purchased cores occurred in the core mill at the south end, including sawing, grooving and sanding.  On the second floor of the door mill was the glue room, saw and sand area, and door inspection site.  On the third floor, the veneer "flitches" were spliced.  There was *no* cutting or sanding of the asbestos mineral core on either the second or third floors.  Finally, although the parties do not identify its location, the plant also contained a detail department, which machined the windows, hinges, locks and other openings and added moldings.

### B.  Plaintiffs

#### i.   Elvira Kilty

Elvira Kilty worked at the Weyerhaeuser plant between 1955 and 1995.  Kilty was diagnosed with mesothelioma on July 16, 2015, and died on September 1, 2015.  Plaintiffs are decedent's living children, and their claims arise from decedent's mesothelioma diagnosis and death.  Because they would otherwise be barred by Wisconsin Workers Compensation law, plaintiffs' negligence claim is premised on household and community exposure.  Plaintiffs' household exposure claim is based on Kilty's exposure to the work

clothes of her four sons, all of whom also worked at the Weyerhaeuser plant.[5]  In particular, while her children were still living at home, Kilty washed their dirty work clothes.

Kilty's son Gary, now deceased, started working at the plant after graduation from high school in May or June of 1966.  He married on August 27, 1966, and moved out of the family home at or around that time.  As such, he lived at home for approximately three months while working at Weyerhaeuser.  None of Gary's brothers had personal knowledge of his work there, although another employee, William Haeni, testified that Gary worked in the detail department installing molding.  On the other hand, Charles Reno provided a declaration averring that Gary Kilty worked in the maintenance department, and during that time, his clothing and person would come into contact with the mineral core dust.[6]

Kilty's son William worked at the Weyerhaeuser facility on two occasions:  (1) after graduating from high school in May 1967 until 1969, when he entered the military; and (2) from May to August 1971.  Because William married straight out of high school in May 1967 and moved out of the family home at that time, none of his work at the Marshfield facility appears to have overlapped with his time residing in the family home. William also testified that he did not work with asbestos mineral core during his employment.  Instead, he worked with wood, and his clothing was dusty from wood dust.

---

[5] In their response to defendant's proposed findings of facts, plaintiffs assert state that Kilty was exposed to asbestos "in family member vehicles, at the residences of the children of Elvira Kilty, and other settings where the children or their clothing were with Elvira Kilty." (Pls.' Resp. to Def.'s PFOFs ('515 dkt. #210) ¶ 23.)  Plaintiffs, however, cite *no* support for this statement.  As such, the court has not considered it.

[6] Haeni did not know the exact dates of Gary's assignment to the detail department, nor was Reno able to provide dates for Kilty's work in the maintenance department.

Kilty's son Dave worked nights at the Marshfield plant for two to three months in 1969 while still in high school and living at home.  During that time, however, Dave did not work in the mineral core area; rather, he worked in the shipping department, loading finished doors and materials into boxcars.  During his deposition, Dave testified that the dust in the shipping department came from sawing wood.

Finally, Kilty's son James worked at the plant from between June 3 and August 5, 1977.  While in high school and living at home, James testified that he worked exclusively with wood and did not work with asbestos.  James worked on the chop line cutting chunks of solid wood for the wood core door and in the kiln drying area if help was needed.

As for Kilty's community exposure, this claim is based on her residing at 703 South Peach Street in Marshfield from 1955 to 1962, which is located approximately 0.5 miles from the Weyerhaeuser facility.[7]  Other than from 1955 to 1962, however, Kilty lived outside of the City of Marshfield, and as described above, the mineral core plant did not open until 1968, six years *after* Kilty moved out of her South Peach Street residence. Moreover, plaintiffs offer no evidence of the presence of asbestos fibers at Kilty's residence, instead directing the court to representations by other residents in homes in similar proximity to the plant of off-white dust covering laundry, windows and window sills.  (Pls.' Add'l PFOFs (dkt. #209) ¶¶ 87-93.)  In response, defendant points out:  (1) the lack of evidence that this dust was mineral core dust, rather than some other light-colored dust

---

[7] This court previously determined that a 1.25-mile range of asbestos manufacturing could result in a significant exposure in light of studies of community exposure to asbestos fibers.  *See Boyer*, 2016 WL 705233, at *19 (describing "zone of risk").

(e.g., from wood or a nearby cement company); and (2) some witnesses testified that the dust was sometimes black.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #259) ¶¶ 87-93.)

In contrast, Kilty was unquestionably exposed to asbestos during her employment at the Marshfield plant.  Indeed, during her employment, Kilty worked directly with asbestos-containing door cores and was part of Weyerhaeuser's asbestos medical surveillance program.[8]  As a result, plaintiff's experts acknowledged that Kilty's occupational exposure was substantially more than her non-occupational exposure and would have been sufficient to account for her mesothelioma diagnosis.  (Def.'s PFOFs (dkt. #173) ¶¶ 48-50.)

### ii.   Herbert Spatz

Herbert Spatz worked at Weyerhaeuser beginning in 1962 until his requirement in 2001, including 11 years in the mineral core mill.  Spatz was diagnosed with mesothelioma on October 28, 2015, and died on January 5, 2016.  Plaintiff Scott Spatz is Herbert's nephew, who asserts survival and wrongful death claims.

Herbert Spatz's assertion of non-occupational exposure is limited to asbestos fibers from his father Joey Spatz's work clothes.[9]  Between 1942 to 1958, Herbert Spatz lived with his family, including his father Joey Spatz, in a railroad boxcar, consisting of a bedroom and kitchen, with no bathroom or running water.  His father worked at Weyerhaeuser as a utility person in the 1950s until at least "two years after mineral core

---

[8] While the parties do not provide specifics as to Weyerhaeuser's medical surveillance program, it appears, at a minimum, to have involved annual medical check-ups, including a chest x-ray. (Pamela Kilty Depo. (dkt. #112) 58.)

[9] Unlike Kilty, Spatz does not assert a community exposure claim.

door production began." (Pl.'s Add'l PFOFs ('726 dkt. #158) ¶ 118.) In his declaration, Richard Luther averred that he "saw Joey Spatz cleaning up the debris and dust from the core mill areas where the door production, including mineral core doors, occurred. I also saw him in other places in the core mill department." (Luther Decl. (dkt. #230) ¶ 13.) Herbert's sister and Joey's daughter, Caroline, testified that Joey wore his work clothes home from work, and those clothes were laundered by hand inside the home on a washboard, though Herbert did not launder his father's clothes.

As with Kilty, Spatz was occupationally exposed to asbestos during his employment at the Marshfield plant, and there is no dispute that this exposure substantially contributed to his mesothelioma diagnosis.

### C. Evidence of Asbestos Emissions

Within the plant, plaintiffs contend that asbestos was not contained within the core mill area, but spread to other parts of the plant through open stairways and elevator shaft openings. (Pls.' Add'l PFOFs (dkt. #209) ¶¶ 16-20.) Although defendant challenges the timing, extent of contamination, and whether the dust (or at least all of the dust) was actually asbestos dust, former employees testified that the asbestos core materials were present on employees' clothing and machines extending beyond the core mill area.

Principally relying on the D.B. Allen memo discussed above, as well as accounts from employees, plaintiffs put forth evidence, of asbestos dust being released from the plant into the parking lot and on yards surrounding the plant, as well as into the community. Specifically, former employees testified that the baghouses the plant used to collect dust, including mineral core dust, frequently became plugged, resulting in dust

14

"shoot[ing] up like a geyser." (*Id.* at ¶¶ 55-66.)  In response, defendant points out that testimony of baghouses routinely becoming clogged and asbestos fibers being emitted into the community concern observations from the 1970s, post-dating the relevant community exposure period here.  (*See, e.g.*, Def.'s Resp. to Pls.' Add'l PFOFs (dkt. #259) ¶ 57.) Plaintiffs point to disposal of asbestos dust in landfills and ponds as another avenue for community exposure.  However, plaintiffs' evidence of community exposure from disposal of asbestos dusts in landfills is also limited to the early 1970s.  (*See, e.g.*, Pls.' Add'l PFOFs (dkt. #209) ¶ 71 (citing letter dated May 18, 1973); Def.'s Resp. to Pls.' Add'l PFOFs (dkt. #259) ¶ 70 (noting that one employee (Gennett) did not start driving waste trucks until 1973 and that another employee (Reno) testified that he drove the truck after Gennett started hauling waste).)

In addition to challenging plaintiffs' evidence as to timing, defendant points out that there were other sources of dust in the community.  Almost every Weyerhaeuser department had machinery that generated waste or dust -- in particular, a large quantity of wood dust. Moreover, dust came from smokestacks from boilers that burned materials including coal, and the baghouses collected dust from the particleboard plant and from the finishing plant.  There were also dirt and gravel roads around the plant, along with a cement plant in Marshfield that generated dust, which defendant represents is similar in color to mineral core dust containing asbestos.

OPINION[10]

In an earlier opinion and order on similar community and household asbestos exposure claims asserted against defendant Weyerhaeuser, this court:  (1) considered a *Daubert* challenge to the same experts on which plaintiffs rely here; (2) set forth the law governing plaintiffs' claims, including their obligation to prove causation; and (3) evaluated the plaintiffs' evidence, including the expert testimony, in light of that legal standard.  *See Boyer v. Weyerhaeuser Co.*, No. 12-CV-899-WMC, 2016 WL 705233 (W.D. Wis. Feb. 19, 2016), *aff'd Pecher v. Owens-Illinois, Inc.*, 859 F.3d 396 (7th Cir. 2017).  As was true in the first wave of asbestos cases, the plaintiffs' claims here rise or fall depending on their ability to marshal sufficient evidence that non-occupational asbestos exposure was a substantial contributing factor to their mesothelioma diagnoses for a reasonable jury to find the causation element satisfied.  In these cases, however, plaintiffs' evidence falls short.

As set forth in great detail in the *Boyer* summary judgment opinion, to prove causation, plaintiffs "need not demonstrate *non*-occupational exposures were the sole cause, the main cause, or even the most likely cause of their disease."  2016 WL 705233 at *17.  Rather, plaintiffs must demonstrate that the non-occupational exposures were "a substantial factor" in producing their respective asbestos-related injuries.  *Id.*; *see also*

---

[10] In its opinion and order on Weyerhaeuser's motion to dismiss, issued after Weyerhaeuser's filing of its motion for summary judgment, the court rejected Weyerhaeuser's argument that plaintiffs' claims are barred by Wisconsin's Workers Compensation Act's exclusivity provision, while agreeing that plaintiffs' nuisance claims are barred by the applicable statute of limitations, granting that aspect of the motion.  (4/17/18 Op. & Order (dkt. #279).)  As such, the court will not revisit either argument.

*Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2001 WI App 148, ¶ 59, 246 Wis. 2d 933, 632 N.W.2d 59.

A "substantial factor" or "substantial contributing factor" means something more than a possible cause.  As the Sixth Circuit explained in *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005), "where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural."  *Id*. at 492

In *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992), the Seventh Circuit emphasized this is *not* a comparative test, explaining that "courts in applying the substantial factor test do not seem concerned with which of the many contributing causes are *most* substantial.  Rather, they seem concerned with whether each contributing cause, standing alone, is a substantial factor in causing the alleged injury."  *Id.* at 424; *see also Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) ("[T]o show that a toxin is 'a cause' or 'a substantial factor,' [plaintiff] was not required to demonstrate that benzene exposure was the sole cause of his disease, so long as he showed that benzene contributed substantially to the disease's development or significantly increased his risk of developing AML.").  Accordingly, the court is to consider "the frequency, regularity, and proximity of exposure in determining whether the injured party's exposure to defendants' asbestos products was a substantial factor in causing the alleged injury."  *Tragarz*, 980 F.2d at 420.

Despite the issue of causation being a centerpiece of defendant's motion for summary judgment and plaintiffs having the burden of proof, they spend a little more than a page in each of their opposition briefs responding to this argument, the bulk of which amounts to broad, general references to their experts' testimony.  Moreover, plaintiffs utterly fail to engage with defendant's specific arguments challenging plaintiffs' proof of non-occupational exposure in these two cases, which is reflected in the dearth of facts supporting a finding of non-occupational exposure set forth above.  As a result, defendant argues in its reply brief that this court should find waiver.  While perhaps warranted, the court nonetheless has reviewed the expert reports and considered whether plaintiffs' evidence provides a reasonable basis for their experts' conclusions.  It does not.[11]

## I.  Kilty's Evidence of Causation

As detailed above, Kilty claims household exposure based on her sons' work at Weyerhaeuser and their living at home for various periods of time during their employment, during which she would have laundered their clothing.  Ignoring that at least one of the boys was not even living at home, and two others were there for a few months, three of Kilty's four sons did not even work in the mineral core mill, and there is no evidence that they were exposed occupationally to asbestos directly as part of this work. In fairness, there appears to be some contradictory information in this regard as to Gary's

---

[11] Instead of filing a separate *Daubert* motion with its motion for summary judgment, defendant challenges the expert testimony in the motions themselves, making that testimony subject to the same analysis as the court's prior opinion and order in *Boyer*. The defendant did subsequently file a motion in limine to exclude plaintiffs' expert testimony at trial.  Given its characterization as a motion in limine, and in light of the fact that the motion was filed after the summary judgment deadline, however, the court set briefing consistently, which means that those *Daubert* motions are not yet under advisement and, for the reasons that follow, are now moot.

son Gary, who is now deceased.  One former Weyerhaeuser worker placed him in the detail department, installing molding, while another employee averred that Gary worked in the maintenance department and during that time would have come into contact with mineral core dust.  Neither former employee, however, provides dates for Kilty's work in those departments, which is critical since Gary only lived at home for a brief period of approximately three months while working at Weyerhaeuser, and his employment with Weyerhaeuser extended well beyond that period.[12]  Moreover, plaintiffs provide *no* evidence that even Gary spent a significant portion of his time in the maintenance department working in areas that would have exposed him directly to asbestos fibers, nor that Gary's work in the detail department, installing molding, exposed him to asbestos directly.

Absent such evidence, the court finds that plaintiffs lack sufficient evidence for an expert to rely on a family member's occupational exposure to opine reliably that Kilty suffered a history of *significant* household exposure.  *See Boyer*, 2016 WL 705233, at *20-21 (discussing plaintiff Masephol's evidence and specifically rejecting a household exposure claim based on father's work in the maintenance department "without any direct evidence that his father worked in the mineral core department", and plaintiff Jacobs' lack of evidence of the length of exposure from her daughter's brief work in the mineral core mill).

---

[12] Plaintiffs' expert Frank Parker erroneously relied on Gary living in the family home for two *years* while employed at Weyerhaeuser, providing another basis for rejecting plaintiffs' expert testimony and, in turn, their evidence of causation.  (*See* Parker Rept. (dkt. #182) 6.)

19

Kilty also pursues a community exposure claim based on having lived at a house within 1.25 miles of the plant, which this court found in *Boyer was* sufficient to survive summary judgment if residing within 1.25 miles of the plant for at least one year.  *See id.* at *21.[13]   In the three claims that survived summary judgment in *Boyer*, however, the plaintiffs resided in homes *after* 1968, when Weyerhaeuser opened the mineral core mill and was manufacturing raw asbestos and door cores containing asbestos on site.   Here, however, Kilty only lived within 1.25 mile radius *before* 1968, from 1955 to 1962.   In their brief in support, defendant describes in great detail the significance of this date range, specifically pointing to:  (1) Frank Parker's admissions that he did not know production levels or the amount of asbestos used at the plant before 1960; (2) anecdotal evidence from other co-workers about asbestos emissions into the community that largely post-dated the opening of the mineral core mill in 1968; and (3) Dr. Anderson's admissions as plaintiffs' expert that he was unaware of any studies of community exposure involving plants that did not use raw asbestos fibers.  (*See* Def.'s Opening Br. (dkt. #172) 35-36; Def.'s Reply (dkt. #257) 9-10; Def.'s PFOFs (dkt. #173) ¶¶ 100, 109, 129.)

Tellingly, plaintiffs did not even allude to this argument in their opposition brief, much less direct the court to evidence or develop an argument supporting their experts' testimony of a community exposure claim predating 1968.   Because plaintiffs' sparse evidence is woefully insufficient to support an expert opinion that Kilty's claimed

---

[13] In reviewing the expert reports, it appears that they rely on the same studies, which supported the court's prior determination of a 1.25 mile "zone of risk" radius.  *See Boyer*, 2016 WL 705233, at *19 (describing "zone of risk").

community exposure was a substantial contributing factor to her mesothelioma diagnosis, the court will grant defendant's motion for summary judgment on Kilty's negligence claim, finding insufficient evidence to support the opinions of experts Parker and Anderson of a significant, non-occupational exposure, a necessary predicate to a reasonable jury finding this exposure was a substantial contributing factor to plaintiffs' contacting mesothelioma.

## II. Spatz's Evidence of Causation

Spatz's evidence of a household exposure as a substantial contributing factor to his mesothelioma diagnosis suffers from the same defect at Kilty's.  As an initial matter, there is *no* evidence that his father, Joey Spatz, was sufficiently exposed to asbestos to act as a predicate for a significant household exposure for Herbert Spatz.  *See Boyer*, 2016 WL 705233, at *21 (discussing similar problems in plaintiffs Jacobs' and Masephol's evidence). While plaintiff offers vague statements from a former employee, Richard Luther, that he saw Joey, a "utility" employee, working in the mineral core area, there is no reference to the length of that assignment.  Moreover, that assignment was during a period of time, the mid 1950s, when Weyerhaeuser's use of asbestos cores in door production was in its early stages, before Weyerhaeuser began working with raw asbestos to produce its own door cores.  Plaintiff admits that his expert Frank Parker has *no* data on the production levels of the Marshfield plant during this time nor on the extent asbestos door cores were being used.  (Pl.'s Resp. to Def.'s PFOFs ('726 dkt. #211) ¶¶ 71-73.)  Finally, Joey's alleged exposure occurred well before the opening of the mineral core mill and Weyerhaeuser's manufacturing of the asbestos door cores onsite.

Even assuming Joey *was* exposed to asbestos in the workplace, plaintiff offers no evidence that Herbert was sufficiently exposed by his father's work clothes in his home to form a reliable basis for an expert to opine, or for a reasonable jury to conclude, that this exposure was a substantial contributing factor to his mesothelioma diagnosis. Notably, for example, Herbert was not the one who laundered his father's clothing, which some academic studies at least suggest as a vehicle for exposing household members to asbestos. *See Boyer*, 2016 WL 705233, at *13 (describing Parker's reliance on studies, including those of "housewives developing asbestos-related diseases from handling clothing and other items that has asbestos fibers on it"). Here, too, plaintiff offers *no* response to defendant's argument in its opening brief that plaintiff lacks evidence of household exposure -- even assuming his father suffered significant occupational exposures -- to support a causation finding. In response to defendant's proposed findings of facts, plaintiff simply admits that Herbert did not handle his father's laundry, but states, with *no* support, "laundry is not the only form of household exposure." (Pl.'s Resp. to Def.'s PFOFs ('726 dkt. #211) ¶ 52.) While this is undoubtedly true, since it is scientifically possible that even a scintilla of exposure to asbestos fibers may cause mesothelioma, this mere possibility is not enough to prove causation. *See Boyer*, 2016 WL 705233, at *22 ("This is not to say that the science precludes the experts' opinion that even a small, single exposure may 'contribute' to the contracting of mesothelioma, only that the science does not support a legal finding that only small and occasional, non-occupational exposure would substantially contribute to contracting mesothelioma.").

Plaintiff's experts' opinions are similarly unsupported.  Dr. Anderson and Frank Parker were provided unsupported hypotheticals, including that they should assume that Joey worked in the core mill for three months in 1954.  Plaintiff admits this, but responds, "Dr. Anderson's opinions at trial will be based on the evidence presented at that time, and the hypotheticals are only for demonstrative purposes."  (*See, e.g.*, Pl.'s Resp. to Def.'s PFOFs ('726 dkt. #211) ¶ 59 (discussing Anderson's testimony; *see id.*, at ¶ 70 (discussing Parker's testimony).)  That is not how summary judgment works.  Defendant having thrown down the gauntlet as to a lack of proof of causation, plaintiff cannot wait until the record is developed at trial to provide grounded, reliable expert opinions.  As the Seventh Circuit observed almost twenty years ago, and this court has oft repeated since, "summary judgment is 'not a dress rehearsal or practice run,' but the 'put up or shut up moment' in which a proponent of facts must show what evidence it has to convince a trier of fact to accept its version of events."  *Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).[14]

As such, the court will grant defendant's motion for summary judgment on Spatz's negligence claim, finding insufficient evidence to support plaintiff's experts Parker and Anderson's assumption of a significant non-occupational exposure as a necessary predicate

---

[14] Even putting aside this burden, plaintiffs' argument that it can wait until trial to show its hand flies in the face of the requirements under Federal Rule of Civil Procedure 26(a)(2).

to their opinion that plaintiff's household asbestos exposure was a substantial contributing factor to his diagnosis of mesothelioma.[15]

ORDER

IT IS ORDERED that:

1) Defendant Weyerhaeuser Company's motions for summary judgment ('515 dkt. #171; '726 dkt. 125) are GRANTED.

2) Plaintiffs' Rule 72 objections to the Magistrate Judge's Order of March 7, 2018 ('515 dkt. #242; '726 dkt. #200) are GRANTED IN PART AND DENIED IN PART as described above.

3) Defendant Weyerhaeuser Company's motions in limine to exclude plaintiffs' expert witnesses ('515 dkt. #251; '726 dkt. #198) are DENIED AS MOOT.

4) Defendant Weyerhaeuser Company's motions to strike plaintiffs' improper summary judgment evidence ('515 dkt. #256; '726 dkt. #209) are GRANTED IN PART AND DENIED IN PART as described above.

5) Defendant Weyerhaeuser's motion for stay ('515 dkt. #284; '726 dkt. #235), Weyerhaeuser's motion to file reply in support of motion to stay ('515 dkt. #289; '726 dkt. #239) and defendant 3M Company's motion to join in motion to stay ('515 dkt. #289; '726 dkt. #240) are all DENIED AS MOOT.

---

[15] In light of the court's decision to grant summary judgment to defendant Weyerhaeuser based on the lack of reliable evidence of causation, the court need not consider its argument that the risk of non-occupational exposure was not known at the time of decedents' alleged community exposure or the lack of availability of punitive damages if plaintiffs could prove liability. One final note regarding the practice of counsel for plaintiffs to file Rule 59 motions for reconsideration when the outcome of an opinion is unfavorable to their clients. Before reflexively doing so here, plaintiffs' counsel should review the standard for such a motion. Notably, it does *not* cover arguments a party simply failed to make in their initial briefing.

6) Upon resolution of plaintiffs' remaining claims against defendant 3M Company, the clerk of court is directed to enter judgment in defendant Weyerhaeuser's favor in both of the above-captioned cases.

Entered this 8th day of June, 2018.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge